1  BILL LOCKYER
     Attorney General of the State of California
2  TOM GREENE
     Chief Assistant Attorney General
3  LOUIS VERDUGO JR.
     Senior Assistant Attorney General
4  ANGELA SIERRA
     Supervising Deputy Attorney General
5  TIMOTHY M. MUSCAT (SB 148944)
   ANTONETTE B. CORDERO (SB 122112)
6    Deputy Attorneys General
     300 South Spring Street
7    Los Angeles, CA 90013
     Telephone: (213) 897-2039
8    Fax: (213) 897-7605

9              IN THE UNITED STATES DISTRICT COURT

10          FOR THE NORTHERN DISTRICT OF CALIFORNIA

11  ───────────────────────  **C  05  00328**

12  **STATE OF CALIFORNIA, ex r.**
    **BILL LOCKYER, in his official**
    **capacity as Attorney General of the**          **COMPLAINT FOR**
13  **State of California; and JACK**                 **DECLARATORY AND**
    **O'CONNELL, in his official capacity as**        **INJUNCTIVE RELIEF**
14  **the State Superintendent of Public**
    **Instruction**

15

16                                    Plaintiffs,

17        **v.**

18  **UNITED STATES OF AMERICA;**
    **UNITED STATES DEPARTMENT OF**
19  **LABOR; ELAINE CHAO, in her**
    **official capacity as the Secretary of**
20  **Labor;  UNITED STATES**
    **DEPARTMENT OF HEALTH AND**
21  **HUMAN SERVICES; TOMMY G.**
    **THOMPSON, in his official capacity as**
22  **the Secretary of Health and Human**
    **Services; UNITED STATES**
23  **DEPARTMENT OF EDUCATION; and**
    **MARGARET SPELLINGS, in her**
24  **official capacity as the Secretary of**
    **Education**

25

26                                    Defendants.

27  ───────────────────────

28

                              1

1

**INTRODUCTION**

2    Since the United States Supreme Court's historic decision more than thirty years ago in *Roe*

3    *v. Wade*, 410 U.S. 113 (1973), American women have had the constitutional right to seek an abortion

4    when necessary to preserve their lives or health, without impermissible interference from the

5    government.    This long-held right, protected under both the United States and California

6    Constitutions, is under attack by the "Weldon Amendment."   This obscure provision, set forth in

7    the federal budget, may subject States to the loss of billions of dollars in federal funding if they take

8    action that amounts to "discrimination" against an entity or an individual who refuses to provide

9    abortion related services.   The  Weldon Amendment does not define the term "discrimination."

10    Instead, it leaves the States, including California, wondering whether they will lose billions of dollars

11    if they act to protect the fundamental rights promised to American women in *Roe v. Wade*.

12    Plaintiffs have no dispute with providing health care professionals the option, under most

13    circumstances, to not perform abortions that would violate their moral, ethical, or religious beliefs.

14    This valid protection currently exists under California law.  But Plaintiffs do dispute that a health

15    care professional's "right" not to participate in abortions includes the right to deny a patient

16    emergency medical care, including medically necessary referrals, under any circumstances.  The

17    Weldon Amendment's constitutional defect is its failure to include an explicit exception for abortion

18    services that may be medically required in emergency situations.  Unless this court finds that the

19    Weldon Amendment impliedly contains the medical emergency exception that exists under

20    California law, the amendment will coerce California to refrain from taking disciplinary action,

21    pursuant to the State's police powers, against a hospital or health care professional who refuses to

22    provide medically necessary emergency abortion services.

23    Congress cannot constitutionally circumvent a woman's fundamental right to reproductive

24    freedom through the Weldon Amendment's draconian funding restrictions.    The Weldon

25    Amendment exceeds Congress' power under the Spending Clause, violates the 10th Amendment, and

26    unconstitutionally restricts women's rights to reproductive freedom.  Because this coercive federal

27    statute is wholly inconsistent with our federal system of government, this court should strike it down

28    as unconstitutional.

2

PLAINTIFF STATE OF CALIFORNIA, EX REL. BILL LOCKYER, IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL OF THE STATE OF CALIFORNIA, AND PLAINTIFF JACK O'CONNELL, IN HIS OFFICIAL CAPACITY AS THE STATE SUPERINTENDENT OF PUBLIC INSTRUCTION, ALLEGE AS FOLLOWS:

**JURISDICTION AND VENUE**

1.    Jurisdiction is proper in this Court pursuant to section 1331 of title 28 of the United States Code because this case involves a civil action arising under the Constitution of the United States, specifically Article I, section 8, clause 1 (the Spending Clause), and the Tenth Amendment and pursuant to section 703 of title 5 of the United States Code. Jurisdiction is also proper under section 2201 of title 28 of the United States Code because Plaintiffs seek a declaration of the rights of the parties to this action as set forth in full below. Pursuant to section 1391 (e)(1) and (3) of title 28 of the United States Code, venue is proper in the Northern District of California because the Attorney General and the State of California have offices at 455 Golden Gate Avenue, San Francisco, California and at 1515 Clay Street, Oakland, California and Defendants have offices at 50 United Nations Plaza, San Francisco, California, and 71 Stevenson Street, San Francisco, California.

**INTRADISTRICT ASSIGNMENT**

2.    Assignment to the San Francisco Division of this District is proper pursuant to Civil Local Rule 3-2(c)-(d) because Plaintiffs and Defendants' primary offices in the district are in San Francisco.

**PARTIES**

3.    Plaintiff State of California is a sovereign state in the United States of America. Plaintiff State of California is aggrieved by the actions of Defendants and has standing to bring this action because of the injury to its sovereignty as a state caused by the challenged federal statute. Any state, including California, that fails to comply with section 508(d) of the Departments of Labor, Health and Human Services, and Education, and Related Agencies Appropriations Act, 2005 is subject to losing all federal funds made available through this Act. For the State of California, the loss could total more than $49 billion. In order to properly plan their fiscal year budgets, the various agencies within the Plaintiff State of California need to know immediately whether they would be subject to

\\

1    this loss of federal funds. Without this information, the various impacted agencies within the

2    Plaintiff State of California cannot presently prepare fiscally sound budgets.

3    4.    Plaintiff State of California's sovereign interests are further aggrieved by the actions of

4    Defendants because section 508(d)(the Weldon Amendment or the Amendment) attempts to deter

5    the State from exercising its police power. Specifically, the Weldon Amendment attempts to deter

6    the State of California from enforcing its own laws regulating the delivery of health care and the

7    practice of medicine regarding emergency abortions.

8    5.    Plaintiff Bill Lockyer is the Attorney General for the State of California, elected pursuant to

9    Article V, section 11 of the California Constitution. As Attorney General, he is the chief law officer

10   in the State of California. (Cal. Const., Art. V, § 13; Cal. Gov. Code, § 12500, et seq.) Plaintiff Bill

11   Lockyer is aggrieved by the actions of Defendants and has standing to bring this action. As the

12   Attorney General for the State of California, Bill Lockyer is responsible for enforcing and protecting

13   California's sovereign interests, including the sovereign interest to enforce California law.

14   6.    Plaintiff Jack O'Connell is the State Superintendent of Public Instruction, elected pursuant to

15   Article IX, section 2 of the California Constitution. As such, Plaintiff Jack O'Connell is also

16   Director of the California Department of Education. Plaintiff Jack O'Connell is aggrieved by the

17   actions of Defendants and has standing to bring this action. Numerous education programs in

18   California are faced with the prospect of losing billions of dollars of federal funds under the Weldon

19   Amendment. The Department of Education functions almost entirely on federal funds and sends

20   billions of dollars to local school districts through the apportionment process. The Department of

21   Education would be devastated and could not operate at all without the federal money it receives.

22   7.    The United States of America is named as a defendant in this action pursuant to section 702 of

23   title 5 of the United States Code.

24   8.    Defendant Elaine L. Chao, Secretary of Labor, is named in her official capacity as the Secretary

25   of the Department of Labor, pursuant to section 702 of title 5 of the United States Code. Defendant

26   Department of Labor (Labor), is an executive department of the United States of America, pursuant

27   to section 101 of title 5 of the United States Code and a federal agency within the meaning of section

28   2671 of title 28 of the United States Code. As such, it engages in agency action, within the meaning

4

1    of section 702 of title 5 of the United States Code and is named as a defendant in this action pursuant

2    to section 702 of title 5 of the United States Code .

3    9.    Defendant Tommy G. Thompson, Secretary of Health and Human Services, is named in his

4    official capacity as the Secretary of the Department of Health and Human Services, pursuant to

5    section 702 of title 5 of the United States Code.  Defendant Department of Health and Human

6    Services (HHS) is an executive department of the United States of America, pursuant to section 101

7    of title 5 of the United States Code and a federal agency within the meaning of section 2671 of title

8    28 of the United States Code.  As such, it engages in agency action, within the meaning of section

9    702 of title 5 of the United States Code and is named as a defendant in this action pursuant to section

10    702 of title 5 of the United States Code .

11    10.    Defendant Margaret Spellings, Secretary of Education, is named  in her official capacity as the

12    Secretary of the Department of Education, pursuant to section 702 of title 5 of the United States

13    Code.  Defendant Department of Education (Education), is an executive department of the United

14    States of America, pursuant to section 101 of title 5 of the United States Code and a federal agency

15    within the meaning of section 2671 of title 28 of the United States Code.  As such, it engages in

16    agency action, within the meaning of section 702 of title 5 of the United States Code and is named

17    as a defendant in this action pursuant to section 702 of title 5 of the United States Code .

18    11.    Each of the agency defendants named in this complaint is an agency of the United States

19    government bearing responsibility, in whole or in part, for the acts complained of in this complaint.

20    Labor, HHS and Education are each responsible for a portion of the funds appropriated by the Act.

21                                            **BACKGROUND FACTS**

22    12.    On or about November 20, 2004, Congress passed the Departments of Labor, Health and

23    Human Services, and Education, and Related Agencies Appropriations Act, 2005 (the Act).  On or

24    about December 8, 2004, the President signed the Act into law.  That Act provides at least $143

25    billion in federal funding to the States for a wide variety of programs.  Specifically, the Act provides

26    the California Department of Education with $5.2 billion in federal funding.  The Act contains a

27    provision known as the Weldon Amendment.  Pursuant to the Weldon Amendment, Defendants may

28    withhold these and other federal funds if they determine that the State of California, including

5

Plaintiffs, has taken an action or engaged in conduct that any Defendant deems "discrimination" within the meaning of the Act. Specifically, the Weldon Amendment prohibits any federal funds "made available in this Act" from being "made available to . . . a State or local government, if such . . . government subjects any institutional or individual health care entity to discrimination on the basis that the health care entity does not provide, pay for, provide coverage of, or refer for abortions."

13.　At least since the U.S. Supreme Court's historic decision in *Roe v. Wade*, 410 U.S. 113 (1973), American women have had the constitutional right to seek an abortion when necessary to preserve their lives or health, without impermissible interference from the government. The Weldon Amendment contains no express exception for situations where the life or health of the woman is at risk. Unless this court finds that the Weldon Amendment does not apply to emergency situations, it could subject the States to the potential loss of billions of dollars if they seek to enforce state laws securing a woman's constitutional right to an emergency abortion without impermissible government interference. As such, the Amendment represents an illegitimate attempt to deter states from protecting the constitutional right of women to choose to obtain abortions that are necessary to protect their lives or health.

14.　California State agencies, including the Department of Education, expect to receive an estimated $49 billion in federal funding under the Act. This $49 billion could be withheld from California agencies, including the Department of Education, if federal officials deem that the State has subjected a health care entity to discrimination on the basis that she, he or it "does not provide, pay for, provide coverage of, or refer for abortions."

15.　As a result of the Weldon Amendment, before enforcing state laws requiring health care entities to provide needed emergency health services, including abortions, California Attorney General Bill Lockyer must consider the threat of massive cuts in federal funding for vital programs. Consequently, the Weldon Amendment will have a dramatic, chilling effect on the enforcement of California law.

16.　The following constitutes a small sample of the various California programs that receive funding under the Act:

\\

a.   **State Unemployment Insurance Program**:

    i.   In California, this program is administered by the California Employment Development Department. The Unemployment Insurance Program (Unemployment Insurance) was established more than 65 years ago as part of the Social Security Act of 1935. Unemployment Insurance provides weekly payments for workers who lose their jobs through no fault of their own and is entirely financed by unemployment taxes paid by employers.   The Employment Development Department administers the program, including collecting taxes, determining eligibility for benefit claims, managing caseloads, processing payments to claimants, recovering overpayments, and adjudicating disputes involving claims or tax liabilities.  The Act provides the Employment Development Department with $6.5 billion in federal funds for the Unemployment Insurance program, which would constitute more than 99 percent of this program's total budget.

    ii.   Over the past years, federal funding to administer the Unemployment Insurance program has decreased dramatically, making it difficult for the Employment Development Department to administer the program.  In calendar year 2003, the Employment Development Department provided unemployment insurance benefits to approximately 3.5 million Californians and paid out $7.4 billion dollars in benefits, all from federal funds.  A total loss of federal funds would prevent California from operating both the unemployment insurance and employment services programs. Even a partial loss of federal funds would hinder service delivery to both programs.  Unemployment insurance payments would be delayed, fraud detection efforts hampered, and overall program timeliness reduced.  Additionally, the tax collection and revenue generating activities would be impacted significantly.

b.   **Employment Service Operations**:

    i.   The Employment Development Department also operates an Employment Service program, which provides a variety of employment-related labor exchange services to employers and job seekers, including but not limited to job search assistance, job

referral, and placement assistance for job seekers, re-employment services to unemployment insurance claimants, and recruitment services to employers with job openings. Job seekers who are veterans receive priority referral to jobs and training, as well as special employment services and assistance. In addition, the Employment Service program provides specialized attention and service to migrant and seasonal farm-workers and youth. The program is part of a nationwide system of public employment offices created by federal law. During fiscal year 2003/2004, employers placed 1.8 million job listings on the Employment Development Department's CALJOBS[SM] labor exchange system, which was used by 1.3 million clients. The Act provides the Employment Development Department with $116.8 million in federal funds for the Employment Services program, which would constitute 88 percent of this program's total budget.

ii.    The Employment Service program would be unable to provide employment referral information to employers and job seekers, as well as other specialized services under the Wagner-Peyser Act (29 U.S.C. §49 et seq.) if federal funds were discontinued. The loss of employment service federal funding would also cause the following:

(1)    eliminate current systems by which employers can recruit for domestic workers before bringing in foreign workers;

(2)    eliminate the local Employment Service field presence enabling job seekers to access other state and federal programs, and

(3)    eliminate Wagner-Peyser-funded employment services for targeted groups, such as migrant seasonal farm workers, veterans, unemployment insurance claimants and recipients of welfare benefits.

c.    **Child Support Enforcement and Family Support Programs**:

i.    The Employment Development Department also receives federal funds from the Department of Child Support Services for child support enforcement and family support programs. The Employment Development Department provides employment, location and income data to governmental entities to help identify the

assets and location of parents who are delinquent in child support obligations. In addition, the Employment Development Department intercepts unemployment insurance benefits and Disability Insurance payments intended for these parents and diverts those payments to California's 58 counties to help meet child support obligations. Federal funds account for 66 percent of the total Department of Child Support Services program costs. The Act provides California with $4.9 million in federal funds for this program.

    ii.   Loss of federal funds could limit the amount of funding provided by the Department of Child Support Services to the Employment Development Department for child support enforcement and family support programs. Without adequate funding, the Employment Development Department would be unable to carry out statutory mandates.

d.   **Child Care and Development Block Grant**: In California, this program is administered by the California Department of Education. This program's purpose is to provide necessary child care services for low-income parents engaged in employment, training, or education activities; and to provide developmentally appropriate child care and school readiness activities for low-income children from birth to age 13. For the state fiscal year 2004/2005 the Education Department has budgeted $874 million in federal funds for this program, which constitute 45.6 percent of this program's total budget. If these federal funds were denied California under the Weldon Amendment, this program would suffer the following harm:

    i.   43.7 percent of families (122,226 of those served) and 50.6 percent of children (228,890 of those served) would lose their child care and development services;

    ii.   without their child care subsidy, many of these parents would be unable to work;

    iii.   without their child care subsidy, some of these children would be left to care for themselves or be in unsafe or unlicensed care;

\\
\\

iv.  $8.3 million for 77 positions, or 82 percent of the Department of Education's operations for administering this program, would be lost. This would put significant pressure on remaining staff to administer the State's portion of the program;

v.  child safety would be jeopardized due to loss of funding to screen license-exempt providers for criminal and child abuse records ($1.4 million); and

vi.  many early childhood teacher and child care providers would be impacted because the following programs could be eliminated:

(1)  local child care planning councils ($5.7 million);

(2)  programs to improve skills of infant/toddler care givers ($15.5 million);

(3)  programs for the professional development of early childhood providers ($12.4 million) and to support staff retention ($18.9 million); and

(4)  programs to improve school readiness ($4.6 million).

e.  **Safe Schools**:

i.  In California, these programs are administered by the Department of Education. The Safe Schools program focuses on prevention of school violence, and alcohol and drug use in schools. In addition, school safety funds are used for crisis preparedness at school sites, training of staff and students in the proper response to crises such as terror events, the installation of infrastructure to help secure school property, and the development of coordinated plans involving law enforcement, emergency responders, and the school administration. California receives $53 million under the Act in federal funds for Safe and Drug-Free Schools and Communities. These federal funds constitute 30 percent of this program's total budget in California. If these federal funds were denied California under the Weldon Amendment, this program would be harmed in the following ways:

(1)  reducing school safety funding could lower students' academic achievement because scientific research has shown that schools with students who perceive that their school is safe have higher test scores than other schools and that test scores improve more over time in schools where there are fewer violent acts and

10

1  where student feel safe;

2  (2)  a reduction in school safety funding would greatly hamper schools' abilities to

3  develop and implement safety plans; and

4  (3)  a reduction in school safety funding would increase the risk of terrorist acts on

5  schools.

6  f.  **Special Education**:

7  i.  The California Department of Education also administers Special Education

8  programs that provide services and support for at least 680,000 California students

9  with disabilities, including preschoolers.  The estimated federal fiscal year 2005

10  allocation to California is $1.1 billion.  These federal funds constitute more than 30

11  percent of the State's budget for this program. If these federal funds are denied

12  California under the Weldon Amendment, this program will suffer the following

13  harm:

14  (1)  local education agencies will not receive an estimated $1 billion in funding for

15  680,000 students with disabilities and districts may have to reduce their support

16  for the general education program in order to maintain federally mandated

17  instruction and services to children with disabilities.

18  (2)  local education agencies would lose all of their funding for preschoolers with

19  extraordinary and/or special needs because it all comes from federal grants; and

20  (3)  the California Department of Education, Special Education Division would be

21  eliminated and no state staff would be available to monitor local education

22  agencies to ensure compliance with state and federal laws.

23  g.  **School Improvement Programs**:

24  i.  Pursuant to the No Child Left Behind Act of 2001, the California Department of

25  Education administers school improvement programs. These school improvement

26  programs are targeted at the lowest achieving students in the schools with the highest

27  levels of family poverty.  These programs, among other things, directly provide

28  supplemental instructional services to low-achieving students, including tutors, aids,

and text books, and assist schools to help students with limited English skills attain English proficiency and meet the same academic achievement standards as other students.  The programs also provide teacher and principal training and recruiting assistance to help schools improve teacher and principal quality  and create opportunities for enhanced and ongoing professional development for mathematics and science teachers.  California receives  more than $600 million in federal funds for these programs.  These federal funds constitute 43 percent of the total budget for these types of programs in California.

17.  Section 508, subdivision (d) of the Act, commonly referred to as the Weldon Amendment, states:

(1) None of the funds made available in this Act may be made available to a Federal agency or program, or to a State or local government, if such agency, program, or government subjects any institutional or individual health care entity to discrimination on the basis that the health care entity does not provide, pay for, provide coverage of, or refer for abortions.

(2) In this subsection, the term `health care entity' includes an individual physician or other health care professional, a hospital, a provider-sponsored organization, a health maintenance organization, a health insurance plan, or any other kind of health care facility, organization, or plan.

18.  Neither the Act nor the Weldon Amendment contains a definition of the terms used in the Amendment, including, but not limited to, "discrimination" and "refer for."

19.   Neither the Act nor the Weldon Amendment clearly states whether the broad restrictions in the Weldon Amendment apply to situations where an emergency abortion is needed to protect the health or life of the woman.  Neither contains an explicit exclusion for such abortions.

20.  As a result, the Weldon Amendment could be read to force the States to allow health care providers not to provide emergency medical care or even refer a woman to another health care provider who can treat the emergency simply because the emergency involves a therapeutic abortion.

\\

21. California law, Health and Safety Code section 1317 requires, in relevant part:

(a) Emergency services and care shall be provided to any person requesting the services or care, or for whom services or care is requested, for any condition in which the person is in danger of loss of life, or serious injury or illness, at any health facility licensed under this chapter that maintains and operates an emergency department to provide emergency services to the public when the health facility has appropriate facilities and qualified personnel available to provide the services or care.

¶

(e) If a health facility subject to this chapter does not maintain an emergency department, its employees shall nevertheless exercise reasonable care to determine whether an emergency exists and shall direct the persons seeking emergency care to a nearby facility which can render the needed services, and shall assist the persons seeking emergency care in obtaining the services, including transportation services, in every way reasonable under the circumstances.

22. California law, Health and Safety Code section 123420, provides:

(a) No employer or other person shall require a physician, a registered nurse, a licensed vocational nurse, or any other person employed or with staff privileges at a hospital, facility, or clinic to directly participate in the induction or performance of an abortion, if the employee or other person has filed a written statement with the employer or the hospital, facility, or clinic indicating a moral, ethical, or religious basis for refusal to participate in the abortion.

No such employee or person with staff privileges in a hospital, facility, or clinic shall be subject to any penalty or discipline by reason of his or her refusal to participate in an abortion. No such employee of a hospital, facility, or clinic that does not permit the performance of abortions, or person with staff privileges therein, shall be subject to any penalty or discipline on account of the person's participation in the performance of an abortion in other than the hospital, facility, or clinic.

\\

13

No employer shall refuse to employ any person because of the person's refusal for moral, ethical, or religious reasons to participate in an abortion, unless the person would be assigned in the normal course of business of any hospital, facility, or clinic to work in those parts of the hospital, facility, or clinic where abortion patients are cared for. No provision of this article prohibits any hospital, facility, or clinic that permits the performance of abortions from inquiring whether an employee or prospective employee would advance a moral, ethical, or religious basis for refusal to participate in an abortion before hiring or assigning that person to that part of a hospital, facility, or clinic where abortion patients are cared for.

The refusal of a physician, nurse, or any other person to participate or aid in the induction or performance of an abortion pursuant to this subdivision shall not form the basis of any claim for damages.

(b) No medical school or other facility for the education or training of physicians, nurses, or other medical personnel shall refuse admission to a person or penalize the person in any way because of the person's unwillingness to participate in the performance of an abortion for moral, ethical, or religious reasons. No hospital, facility, or clinic shall refuse staff privileges to a physician because of the physician's refusal to participate in the performance of abortion for moral, ethical, or religious reasons.

(c) Nothing in this article shall require a nonprofit hospital or other facility or clinic that is organized or operated by a religious corporation or other religious organization and licensed pursuant to Chapter 1 (commencing with Section 1200) or Chapter 2 (commencing with Section 1250) of Division 2, or any administrative officer, employee, agent, or member of the governing board thereof, to perform or to permit the performance of an abortion in the facility or clinic or to provide abortion services. No such nonprofit facility or clinic organized or operated by a religious corporation or other religious organization, nor its administrative officers, employees, agents, or members of its governing board shall be liable, individually or collectively, for failure or refusal to participate in any such act. The failure or refusal of any such corporation, unincorporated

association or individual person to perform or to permit the performance of such medical procedures shall not be the basis for any disciplinary or other recriminatory action against such corporations, unincorporated associations, or individuals. Any such facility or clinic that does not permit the performance of abortions on its premises shall post notice of that proscription in an area of the facility or clinic that is open to patients and prospective admittees.

(d) This section shall not apply to medical emergency situations and spontaneous abortions.

Any violation of this section is a misdemeanor.

23. Read together and with the California Constitution and other requirements of California law, the foregoing provisions of the Health and Safety Code require California health care facilities equipped to do so to provide abortions in a medical emergency without exception.

24. The California Attorney General, pursuant to Article V, section 13 of the California Constitution, has the duty to see that the laws of the State are uniformly and adequately enforced.

25. In addition, pursuant to Business and Professions Code, section 17200, et seq., the California Attorney General has the authority to bring an action for civil penalties and injunctive relief to redress any unlawful, unfair or fraudulent business act or practice. Any business practice that is in violation of any state or federal law, including any violation of Health and Safety Code section 1317, constitutes an unlawful business practice under Business and Professions Code section 17200 et seq. Consequently, the California Attorney General has the authority to bring an action to enforce the provisions of any state law, including but not limited to Health and Safety Code section 1317.

26. The State of California, through its state agencies, has the discretion under state law to take disciplinary action against health care entities and health care professionals who refuse to provide abortion related services in emergency situations where such services are necessary to protect the life or health of a woman.

\\

\\

\\

15

# FIRST CLAIM FOR RELIEF

## VIOLATION OF CONGRESSIONAL SPENDING AUTHORITY

### (Vagueness)

27.   The allegations of paragraphs 1-26 are incorporated into this claim for relief as though fully set forth.

28.   Congress' spending power is not unlimited.  Rather, when "Congress desires to condition the States' receipt of federal funds, it 'must do so unambiguously . . ., enabl[ing] the States to exercise their choice knowingly, cognizant of the consequences of their participation.'"  *South Dakota v. Dole*, 483 U.S. 203, 207 (1987).

29.   Congress exceeded its power under the Spending Clause by enacting the Weldon Amendment because the Weldon Amendment is vague and does not provide States with adequate notice of what action or conduct, if engaged in by the State, would result in the withholding of federal funds. Consequently, the States cannot make a knowing choice whether to comply with the Weldon Amendment or to forgo federal funding by taking action or engaging in conduct that could be deemed discrimination within the meaning of the Amendment.

30.   The Weldon Amendment, is vague and would require the State of California and the California Attorney General to guess at what conduct would violate the funding condition.  For example, it is unclear whether enforcement of Health and Safety Code section 1317 against a health care entity that refused to provide emergency abortion services would constitute "discrimination" within the meaning of the Weldon Amendment.

31.   Because neither the California Attorney General, nor any other state official, can determine with any reasonable level of certainty whether enforcement of Health and Safety Code, section 1317, or any other law, would constitute a violation of the conditions of the Weldon Amendment, the State of California and the Attorney General cannot make a knowing choice whether to forgo such enforcement.  In addition, because there is a potential loss of billions of dollars to the State, the uncertainty about what is meant by, for example, "discrimination," creates a  chilling effect on the California Attorney General's willingness to take action against a health care entity who refuses to provide emergency abortion services as required by Health and Safety Code section 1317.  Therefore,

Congress has exceeded its authority under the Spending Clause in passing the Weldon Amendment.

## SECOND CLAIM FOR RELIEF

## VIOLATION OF CONGRESSIONAL SPENDING AUTHORITY

### (Unrelatedness)

32.   The allegations of paragraphs 1-31 are incorporated into this claim for relief as though fully set forth.

33.   To be valid under the Spending Clause, federal funding conditions must be rationally related to the federal interest in the particular program that receives federal funds.

34.   As described in detail in paragraph 16, various education and employment programs in California receive billions of dollars in funding under the Act, and there is no rational relationship between the Weldon Amendment and the federal interest in these programs.

35.   By effectively preventing the State of California and the California Attorney General from enforcing laws and regulations protecting the reproductive rights of California women, including requirements that necessary *emergency* abortion services be provided, the Weldon Amendment is even further removed from the goals and federal interests identified in the programs described in paragraph 16.

36.    Therefore, Congress has exceeded its authority under the Spending Clause in passing the Weldon Amendment because the restrictions it imposes are not rationally related to the affected national projects or programs.

## THIRD CLAIM FOR RELIEF

## VIOLATION OF CONGRESSIONAL SPENDING AUTHORITY

### (Coercion)

37.    The allegations of paragraphs 1-36 are incorporated into this claim for relief as though fully set forth.

38.    Under the Spending Clause, Congress may not condition the receipt of federal funds in such a way as to leave the States with no practical alternative but to comply with the federal restrictions. Thus, Congress may not offer financial inducements that are so coercive as to pass from pressure to compulsion.

39.     By including the Weldon Amendment in the Act, Congress has forced the State of California and the California Attorney General to either forgo enforcement of state laws, such as that requiring health care entities to provide emergency abortion services, or to enforce such law at the risk of causing California to lose billions of dollars in federal funds.  Those federal funds would include funds for education and labor programs that bear no relationship to the Weldon Amendment. Moreover, the Weldon Amendment forces the State of California to abandon the exercise of its sovereign police powers.  For example, the Weldon Amendment attempts to deter the State of California from enforcing its own laws regulating the delivery of  health care and the practice of medicine regarding emergency abortions in order to avoid the risk of losing billions of dollars in federal funds.  The Weldon Amendment imposes this risk on the State of California even though the regulation of health care and the practice of medicine is generally reserved to the States in the sound exercise of their police powers.  The Weldon Amendment's funding restriction is so broad and severe as to leave the Plaintiffs with no choice but to accede to Congress's dictates and surrender to the federal government the exercise of the State of California's police powers in this important area of public health.

40.     The Weldon Amendment's coercive restriction is beyond the scope of Congress's enumerated powers. Because no provision of the United States Constitution vests Congress with the power to directly enact the restrictions in the Weldon Amendment as law, the Amendment is an unconstitutional abuse of Congress's spending authority and a violation of the Tenth Amendment.

**FOURTH CLAIM FOR RELIEF**

**VIOLATION OF CONGRESSIONAL SPENDING AUTHORITY**

**(Independent Constitutional Bar)**

41.     The allegations of paragraphs 1-40 are incorporated into this claim for relief as though fully set forth.

42.     Permissible exercises of federal power under the Spending Clause cannot involve "invidiously discriminatory state action." *South Dakota v. Dole*, 483 U.S. 203, 210 (1987).

43.     Under *Roe v. Wade*, 410 U.S. 113 (1973); *Planned Parenthood v. Casey*, 505 U.S. 833 (1992) and *Steinberg v. Carhart*, 530 U.S. 914 (2000), among other cases, women in the United

States possess a federal constitutional right to be free of impermissible government interference when they seek medically necessary abortions at any stage of pregnancy.

44.     A law or regulation that restricts a woman's access to abortion care is unconstitutional if it does not contain an exception for abortions necessary to protect a woman's life or health.

45.     Moreover, even where the government does not directly restrict access to abortions, it may not impose an undue burden on a woman's ability to make the decision whether to procure an abortion. An undue burden is imposed if a law or regulation has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion.

46.     As described in detail in paragraphs 21 and 22, Health and Safety Code sections 1317 and 123420, read together, create a regulatory scheme that secures a woman's right to a medically necessary abortion by requiring health care facilities that provide emergency services to perform medically necessary emergency abortions. In other words, medically necessary abortions in California are treated equally with other medically necessary procedures.

47. The Weldon Amendment does not contain an express exception for abortion care necessary to protect the life or health of the woman.

48.     The word "discrimination" in the Weldon Amendment, if read to apply to laws like Health and Safety Code section 1317, could deter the State of California from enforcing section 1317 against health care providers who seek to treat medically necessary abortions differently from other medically necessary procedures. In this way, the Weldon Amendment impermissibly interferes with a woman's access to abortion in California in violation of the federal constitution.

**FIFTH CLAIM FOR RELIEF**

**VIOLATION OF WOMEN'S PRIVACY, BODILY INTEGRITY AND AUTONOMY, LIBERTY, LIFE, AND DUE PROCESS GUARANTEED BY THE FIFTH AMENDMENT OF THE UNITED STATES CONSTITUTION**

49.     The allegations of paragraphs 1 - 48 are incorporated into this claim for relief as though fully set forth.

50.     Under *Roe v. Wade*, 410 U.S. 113 (1973); *Planned Parenthood v. Casey*, 505 U.S. 833 (1992) and *Steinberg v. Carhart*, 530 U.S. 914 (2000), among other cases, women in the United

19

States possess a federal constitutional right to be free of undue government interference when they seek medically necessary abortions at any stage of pregnancy.

51.    A law or regulation that restricts a woman's access to abortion care is unconstitutional if it does not contain an exception for abortions necessary to protect a woman's life or health.

52.    Because the Weldon Amendment contains no exception for circumstances where an abortion is necessary to protect the life or health of the woman, it may result in preventing some women from obtaining medically necessary emergency abortions altogether; delay some women in obtaining medically necessary abortions, thus increasing the risks of the procedure; and force some women to have riskier procedures, or to endure risks that endanger their health or lives.

53.    Because the Weldon Amendment restricts women's access to medically necessary abortion care without providing an exception for abortions necessary to protect their lives or health, it violates women's rights to privacy, life, and liberty, guaranteed by the Due Process Clause of the Fifth Amendment.

54.    In addition, the Weldon Amendment imposes substantial obstacles in the path of women requiring medically necessary emergency abortions, and therefore, impermissibly restricts their rights to choose and have access to non-elective medical care.

55.    Consequently, the Weldon Amendment violates women's rights to privacy, life, and liberty guaranteed by the Due Process Clause of the Fifth Amendment.

## SIXTH CLAIM FOR RELIEF

## DECLARATORY RELIEF

56.    The allegations of paragraphs 1- 55 are incorporated into this claim for relief as though fully set forth.

57.    An actual controversy exists in that Plaintiffs contend that if the enforcement of facially-neutral laws designed to protect the health and welfare of California residents, including but not limited to Health and Safety Code section 1317 or any other law requiring that health care entities provide emergency abortion services, were deemed to constitute a violation of the conditions of the Weldon Amendment, the Amendment would be unconstitutional. The Amendment, contains no exception for emergency or medically necessary abortions, but rather is stated in unqualified

language that facially applies to such situations. Because Defendants are given the authority to withhold federal funds from California for violations of the Amendment and because the Amendment contains no exception for emergency or medically necessary abortions, Plaintiffs believe that Defendants may withhold federal funds from California under the Amendment were the Attorney General to enforce, for example, Health and Safety Code section 1317 requiring that health care entities provide emergency abortion services.

58.     A determination of the meaning of the Amendment is necessary so that the Plaintiffs will know what actions state officials may undertake without subjecting California state agencies to the potential loss of billions of dollars. A declaration of the rights of the parties and of the proper interpretation of the Weldon Amendment is appropriate pursuant to 28 United States Code Section 2201.

59.     Plaintiffs are entitled to a declaration that the enforcement of facially-neutral laws designed to protect the health and welfare of California residents, including but not limited to Health and Safety Code section 1317 or any other law requiring that health care entities provide emergency abortion services, does not constitute a violation of the conditions of the Weldon Amendment.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs State of California, Bill Lockyer and Jack O'Connell pray for judgment against each of the Defendants as follows:

1.     As to the first claim for relief, for a declaration that the Weldon Amendment is unconstitutional and exceeds the power of Congress under the Spending Clause because it is so vague as to fail to give the States, generally, and Plaintiffs, in particular, adequate notice as to what is prohibited. This ambiguity prevents the States and their constitutional officers from making a knowing choice whether to comply with Congress' restrictions or to forgo federal funding;

2.     As to the second claim for relief, for a declaration that the Weldon Amendment is unconstitutional and exceeds the power of Congress under the Spending Clause because it is not rationally related to the federal purpose for which the funds in the Act are appropriated.

3.     As to the third claim for relief, for a declaration that the Weldon Amendment is unconstitutional and exceeds the power of Congress under the Spending Clause because the scope

1  of the potential loss of federal funds is so great as to leave the States with no choice but to comply

2  with the federal restrictions; and, as such, the Weldon Amendment is unconstitutionally coercive;

3  4.    As to the fourth claim for relief, for a declaration that the Weldon Amendment is

4  unconstitutional and exceeds the power of Congress under the Spending Clause because it constitutes

5  invidiously discriminatory governmental action;

6  5.    As to the fifth claim for relief, for a declaration that the Weldon Amendment is

7  unconstitutional because it violates women's right to privacy, life, and liberty, guaranteed by the

8  Due Process Clause of the Fifth Amendment;

9  6.    For a permanent injunction enjoining Defendants, and any persons acting on their behalf,

10  from enforcing the provisions of the Weldon Amendment or from withholding federal funds

11  appropriated under the Act from any California state entity because of any alleged violation of the

12  Amendment;

13  7.    In the alternative, for a declaration that the enforcement of facially-neutral laws designed to

14  protect the health and welfare of California residents, including but not limited to Health and Safety

15  Code section 1317 or any other law requiring that health care entities provide emergency abortion

16  services, does not constitute a violation of the conditions of the Weldon Amendment.

17  8.    For costs of this suit; and

18

19

20

21

22

23

24

25

26

27

28

1    9.    For such other and further relief as the Court deems just and proper.

2    Dated:  January 25, 2005

3                            Respectfully submitted,

4                            BILL LOCKYER
                              Attorney General of the State of California
5                            TOM GREENE
                              Chief Assistant Attorney General
6                            LOUIS VERDUGO JR.
                              Senior Assistant Attorney General
7                            ANGELA SIERRA
                              Supervising Deputy Attorney General
8                            TIMOTHY M. MUSCAT
                              Deputy Attorney General

9

10   ANTONETTE CORDERO (SB 122112)
                              Deputy Attorney General
11

12                           Attorneys for Plaintiffs

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28